# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| v. | Criminal No. 15-161 |
| **JEFFREY JOHN VALENTA**, | |
| Defendant. | |

## MEMORANDUM OPINION

CONTI, District Judge.

Pending before the court is a motion to suppress evidence and statements (ECF No. 40) filed by defendant Jeffrey John Valenta ("defendant" or "Valenta") in the above-captioned case. On July 21, 2015, a federal grand jury in the Western District of Pennsylvania returned a two-count indictment charging defendant with receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) and possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). (ECF No. 1.) On December 5, 2016, defendant filed a motion to suppress evidence (ECF No. 40) and a motion *in limine* to compel the government to provide defendant with a statement of uncharged misconduct evidence. (ECF No. 41). The court held a hearing on defendant's pretrial motions on February 10, 2017. (ECF No. 55.)

During the hearing, the court denied as moot defendant's motion *in limine* to compel the government to provide defendant with a statement of uncharged misconduct evidence given the government's statement that it will provide this evidence at least two weeks prior to trial. (Id.) The court granted defendant's motion for an evidentiary hearing on defendant's motion to suppress. (Id.) The court granted this motion in order to address, among other things, the voluntariness of defendant's statements and issues with respect to the search warrant executed at

1

defendant's home on January 6, 2011.[1] (ECF No. 66 at 4.) The only witness the court heard testimony from with respect to defendant's motion to suppress was Detective Robert Erdely ("Detective Erdely"). (Id.) The parties filed proposed findings of fact and conclusions of law on the two grounds raised in the motion to suppress: (1) alleged violations of the Miranda requirements; and (2) the voluntariness of defendant's confessions. Defendant filed his proposed findings of fact and conclusions of law on March 24, 2017. (ECF No. 62.) The government filed its proposed findings of fact and conclusions of law on April 7, 2017. (ECF No. 65). Upon consideration of parties' submissions and the evidence and testimony presented at the suppression hearing, the court makes the following findings of fact and conclusions of law:

I.  **Findings of Fact**

1. Detective Erdely and Corporal Roche (collectively, the "officers") executed a search warrant at defendant's residence on January 6, 2011. (ECF No. 66 at 19.)

2. The officers were in plain clothes, had concealed weapons, and were in an unmarked car. (Id.)

3. Upon arrival at defendant's residence, Detective Erdely's preference was to speak with defendant without showing him the search warrant. (Id. at 49.) It was Detective Erdely's intention to ask for defendant's consent to search the premises. (Id. at 50.)

---

[1] In his original motion, defendant raised issues with respect to the search warrant executed at his residence. Defendant claimed that in the state court proceedings on this matter, the Commonwealth of Pennsylvania only provided a search warrant for the residence of James A. Kladnik. (ECF No. 40 at 5.) Defendant conceded that the government provided his counsel in the instant matter with a search warrant purporting to be for defendant's home prior to the hearing before this court, but asserted that if the search for defendant's home was based on an erroneous warrant that the fruits of this search must be suppressed. (Id.) Prior to the hearing, the government provided the search warrant for defendant's house to the court. (ECF 54-1.) Detective Erdely testified that he had a warrant to search defendant's residence and that the search warrant provided to the defendant and the court was the same search warrant executed on January 6, 2011. (ECF No. 66 at 18–20.) Following the hearing, defendant withdrew his argument that an erroneous search warrant was used to authorize the search of defendant's residence on January 6, 2011. (ECF No. 62 n. 3.)

4. Defendant invited the officers into the residence. (Id.)

5. Defendant asked to go upstairs, at which point officers executed the search warrant, because the officers were aware that defendant had a registered handgun and felt that allowing defendant to go upstairs would put them at risk. (Id. at 50, 64–65.)

6. After the officers disclosed the existence of the search warrant, Corporal Roche began to search the premises while Detective Erdely questioned defendant. (Id. at 21.) The majority of the interview was conducted by Detective Erdely, while Corporal Roche conducted a search of the residence. (Id. at 52.)

7. Detective Erdely began questioning defendant in defendant's dining room. (Id. at 50.) After approximately twelve minutes, Detective Erdely expressed concern about defendant's eleven-year-old daughter hearing the conversation given the sensitive nature of the interview. (Id. at 66-67; Ex. F at 12:00.) Defendant agreed to move the conversation to a room in the upstairs portion of the house in order to be further away from his daughter. (Id.; ECF No. 66 at 56.)

8. Throughout the interview defendant's daughter remained in the house. (Id. at 21.) Defendant's daughter was in a separate room from defendant throughout the interview. (Id.) Neither Detective Erdely nor Corporal Roach actively curtailed the movement of defendant's daughter during the interview. (Id. at 67.)

9. Near the onset of the questioning, Detective Erdely asked defendant's permission to record the conversation. (Id. at 53.) At that time, defendant asked whether he needed an attorney. (Id.) Detective Erdely told defendant that he was welcome to talk to an attorney or to listen to the detective first. (Id.; Ex. F at 2:50). Defendant agreed to talk with Detective Erdely. (ECF No. 66 at 53). While this interchange took place prior to the start of the recording,

Detective Erdely reviewed this part of the conversation once the recording began. At that time he stated:

> ERDELY: You said you're starting to think that maybe I need to talk to an attorney. I said, you're more than welcome to, but you can also listen to what I have to say and make a decision for yourself and you agreed.
>
> VALENTA: Yes

(Ex. F at 2:40)

10. Early in the conversation, Detective Erdely told defendant "you're not under arrest, you're free to leave, this is a fact-finding mission . . . sometimes people feel they're not free to leave because the police are here." (Ex. F at 1:20.)

11. Detective Erdely also told defendant "at any moment in time if you want to leave or if you do want to use your phone then you're certainly welcome to do that." (Id. at 2:35.)

12. Detective Erdely explained that defendant could not roam the house freely because the detectives were concerned about the preservation of evidence and officer safety, given that defendant had a gun in the home. (Id. at 2:20; ECF No. 66 at 55, 66.)

13. During the interview the detective's tone was conversational. (Id. at 51-52.)

14. Neither officer drew his weapon or placed defendant in handcuffs. (Id. at 52.)

15. Defendant cooperated with the officers and did not appear to be afraid during the course of the interview. (Id. at 61.)

16. Near the end of the interview defendant expressed an interest in calling an attorney. (Id. at 57; Ex. F at 27:10.) The following colloquy took place between Detective Erdely and defendant:

> VALENTA: I wish I had money to have an attorney . . .

| ERDELY: | You can call anyone you want. If you want to call an attorney I certainly will stop this interview and give you time. It's always just been you and me talking because I want to know what's going on in your head, but if you want an attorney then I will stop this interview and give you an opportunity to talk to him. If you find an attorney to talk to, I'll talk to him if he has any questions of me as to what went on, I'm just |
|---|---|
| VALENTA: | I want to cooperate, I want to cooperate. I want to get this over with. I want to move on with my life. |

(Ex. F at 27:05.)

17. After the interview, Detective Erdely expressed concern about defendant's daughter staying in the house alone with defendant and indicated that if the daughter were to remain in the home that evening he would have to call Child and Youth Services. (Id. at 59.) Detective Erdely agreed not to call Child and Youth Services, and instead to allow defendant to take his daughter to his sister's residence for the evening. (Id. at 59; Ex. at 28:00).

## II. Conclusions of Law

### Miranda Warnings

1. A defendant who has "been taken into custody or otherwise deprived of his freedom of action in any significant way" must be given the warnings prescribed in Miranda v. Arizona, 384 U.S. 436, 437 (1967).

2. These warnings are required because custodial interrogation involves "inherently compelling pressures." Id. at 467. Because defendant was not given his complete Miranda

5

warnings, the court must determine whether his questioning was custodial.

3. There are two discrete inquiries in determining whether an interrogation was custodial: "(1) the circumstances surrounding the interrogation and (2) given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave." Yarborough v. Alvarado, 541 U.S. 652, 653 (2004). "Once the . . . players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Thompson v. Keohane, 516 U.S. 99, 112 (1995). Courts should consider all the circumstances surrounding the interrogation, including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave. J.D.B. v. North Carolina, 564 U.S. 261, 270–71 (U.S. 2011). The mindset or subjective views and opinions of either the person being questioned or the interrogating officer is irrelevant to the inquiry. Id. at 271.

4. The Court of Appeals for the Third Circuit has compiled five factors which courts consider as part of a Miranda custody inquiry: "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." United States v. Willaman, 437 F.3d 354, 359-60 (3d Cir. 2006); *see* United States v. King, 604 F.3d 125, 138 (3d Cir. 2010).

5. Also relevant to the inquiry is "the information known by the officer concerning the suspect's culpability", United States v. Jacobs, 431 F.3d 99, 105 (3d Cir.2005) (citing Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir.1974)), and "whether the officer revealed his or her

belief that the suspect was guilty." Id.; Stansbury v. California, 511 U.S. 318, 325 (1994)) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.").

6. "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion . . . the burden shifts to the government." United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citations omitted). A defendant "satisfies that burden if he alleges that he was subjected to custodial questioning without the benefit of Miranda warnings," at which point the government must "prove by a preponderance of the evidence that 'there was no custodial interrogation implicating Miranda, there was some exception to the Miranda rule, or ... [the defendant] ... was properly Mirandized and waived his rights.' " United States v. Tudoran, 476 F. Supp. 2d 205, 216 (N.D.N.Y. 2007) (quoting United States v. Miller, 382 F. Supp. 2d 350, 365 (N.D.N.Y. 2005)); United States v. Kofsky, Criminal Action No. 06-392, 2007 WL 2480971, at *14 (E.D. Pa. Aug. 28, 2007) ("Where a defendant seeks to suppress a statement under Miranda, the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of Miranda warnings."); *see* Colorado v. Connelly, 479 U.S. 157, 168 (1986). Here, defendant seeks to suppress a statement on the basis that the government failed to provide Miranda warnings. The government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of a custodial interrogation.

7. "It is settled that at a hearing on a motion to suppress, 'the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.' "

United States v. Leveto, 343 F.Supp.2d 434, 442 (W.D.Pa.2004) (quoting United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir.1993), and citing United States v. Matthews, 32 F.3d 294, 298 (7th Cir.1994); United States v. Cardona-Rivera, 904 F.2d 1149, 1152 (7th Cir.1990); Government of the Virgin Islands v. Gereau, 502 F.2d 914, 921 (3d Cir.1974)). Whether a suspect is in custody is an objective inquiry, J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011), which is determined on a case-by-case basis. United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999).

8. In the instant matter, defendant argues that he was subject to a custodial interrogation at his home when he was questioned by Detective Erdely and Corporal Roche, and that Miranda warnings should have preceded the officers' questions. The government argues that defendant was not in custody when questioned. Viewing the totality of the circumstances, the court concludes that the Willaman factors weigh in favor of a finding that defendant was not "in custody" during the questioning at his home, and that consequently defendant was not entitled to receive Miranda warnings prior to being questioned. United States v. Lawrence, 892 F.2d 80 (6th Cir. 1989).

9. Three of the five Willaman factors weigh in favor of a finding that Valenta's questioning was noncustodial, and the remaining two factors are neutral.

10. With respect to the first factor, Detective Erdely told defendant at the outset that he was not under arrest and that he was free to leave. (ECF No. 66 at 50.) He explained to defendant that he was not under arrest, he was free to leave, and the officers were there on a fact-finding mission. (Ex. F at 1:20.) Detective Erdely also told defendant that if he wanted to leave or use his cellphone he was free to do so. (Id. at 2:35.) When defendant questioned whether or not he should get an attorney near the end of the interview, Detective Erdely told defendant that

8

he would stop the interview in order to allow him to seek representation.[2] (Id. at 57.) Based upon the detective's statements to defendant and his willingness to terminate the interview at defendant's request, the first factor weighs in favor of a finding that the interview was noncustodial.

11. With respect to the second Willaman factor, defendant was questioned in his own residence. While not determinative, " 'courts are more likely to find that a Defendant is not in custody when he is in the comfort of his own home.' " United States v. McFall, No. CRIM. 07-411, 2012 WL 194078, at *6 (W.D. Pa. Jan. 19, 2012) (citing United States v. Rodriguez, Criminal Action No. 09–00219, 2010 WL 1485704 at *7 (M.D.Pa. Apr.12, 2010)). The Supreme Court explained in Miranda that:

> In his own home [the suspect] may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions of criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. In his office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law.

Miranda, 384 U.S. 436, 449–50 (1966); see United States v. Perrin, 659 F.3d 718, 721 (8th Cir. 2011) (noting (1) that although the bedroom in which the interrogation in that case occurred was police dominated, "[a] reasonable person would have taken some comfort . . . in being in his own

---

[2] With respect to defendant's alleged requests for an attorney, the court agrees with the government that defendant did not invoke his right to counsel. "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Davis v. United States, 512 U.S. 452, 461–62, (1994); see United States v. Briggs, 347 F. App'x 750, 754 (3d Cir. 2009) (finding that defendant's alleged statement to police that he did not want to answer questions until he determined whether his mother had obtained counsel for him "was not a sufficiently clear and unambiguous invocation of his right to counsel so as to require the agents to cease questioning."). In Davis, the Supreme Court concluded that the defendant's statement, "Maybe I should talk to a lawyer," was not an unequivocal request for counsel, and that consequently the officers questioning the defendant were not required to stop the interview in order to clarify whether defendant in fact wanted a lawyer or to provide him with access to one. Davis, 512 U.S. at 462. Here, defendant's statements – "[I'm] starting to think that maybe I need to talk to an attorney" and "I wish I had money to have an attorney" (Ex F. at 2:40, 27:05) – are substantively similar to the statement the defendant made in Davis. Both statements suggest an interest in talking to an attorney, but neither involves a direct request for legal representation. The court finds that defendant did not make an unambiguous or unequivocal request for counsel, and, therefore, Detective Erdely's decision to continue the interview was proper.

bedroom instead of an interrogation room at the police station" and (2) that "[a]ny warrant search is inherently police dominated [and] there is nothing untoward about that circumstance."); Willaman, 437 F.3d at 360 (citing United States v. Czichray, 378 F.3d 822, 826-27 (8th Cir. 2004) ("When a person is questioned on his own turf . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.").

12. There are, however, situations where questioning an individual in his home may be custodial. In United States v. Taylor, 22 F. Supp. 3d 387, 391 (M.D. Pa. 2014), the court looked at whether the defendant in question enjoyed any of the specific "advantages" outlined in Miranda as a result of being questioned in his own home. Having found that the defendant did not enjoy these advantages the court determined that this factor was "[a]t best . . . neutral." Taylor, 22 F. Supp. 3d at 391. Here, defendant had some of the advantages of the home outlined in Miranda; however, he was not "confident, indignant, or recalcitrant," and he was not reluctant to tell about his indiscretions, as evidenced by his cooperation with the detective and answering of his questions.

13. Also of concern, is the presence of defendant's family in the home – namely, his eleven-year-old daughter. Defendant argues that her presence, particularly, her separation from defendant, weighs in favor of a finding that the interview was custodial. *See* United States v. Griffin, 7 F.3d 1512, 1518–19 (10th Cir. 1993) (finding that "separation of the suspect from family" may weigh in favor of a finding that defendant was in custody because such separation can indicate circumstance where "police are in full control of the questioning environment."). The court "must apply an objective test," to determine whether the separation of defendant from his daughter would cause a reasonable person to believe that he was not free to terminate the interview. Thompson v. Keohane, 516 U.S. 99, 112 (1995). Here, the government presented

unrefuted evidence that defendant was separated from his daughter during the questioning as a direct result of the sensitive nature of the discussion, and that defendant agreed to conduct the interview out of ear shot of his daughter so that she would not be able to hear the content of the conversation. (ECF No. 66 at 55-56.) A reasonable person would not believe that he could not terminate an interview and leave the premises with his child simply because he agreed to have a conversation out of earshot of that child.

14. Defendant also claims that he believed he could not leave the premises, because to do so would mean leaving his daughter with the two officers. In support of this belief defendant points out that the officers never explicitly told him "that he could leave *with his daughter*." (Id. at 3.) The evidence, however, does not support a finding that a reasonable person would have believed that he could not leave the premises either with or without his daughter. Detective Erdely told defendant multiple times that he was free to leave. (Ex. F at 1:20; 2:35.) At no point did he tell defendant that if he left he would have to leave his daughter in the custody of the officers. The recording of the interview indicates that near the conclusion of the questioning the following colloquy took place between defendant and Detective Erdely with respect to defendant's daughter:

ERDELY: I don't think it's wise for your daughter to be here.

VALENTA: Ever?

ERDELY: No I'm not saying ever. It's not my place to forbid you to do it. But . . . I don't want to have to get children and youth involved or anything where they come into your home tonight and try to interview your child or anything like that. That's what I don't want to do. Do you understand what I'm saying? So if you can find a

11

> way that your daughter is staying somewhere else tonight then that might be better than calling out somebody to do this interview . . . at this point I have certain things that I'm required to do and one of which is dealing with the eleven-year-old downstairs. I'm just trying to think how we can best . . .
>
> VALENTA: Can I take her to my sister's house?
>
> ERDELY: Yeah. I mean that would be acceptable.

(Ex. F at 25:04.) At no point in this dialogue did Detective Erdely suggest that the officers would stop him from taking his daughter with him if he decided to leave the premises. It was only at the end of the conversation that Detective Erdely told defendant that he would need to call Child and Youth Services if defendant wanted to stay with his daughter in the home. The question whether defendant's daughter could remain at his residence was not raised until the end of the questioning, which suggests that during the course of the interview defendant was not concerned about his ability to leave the premises with his daughter, and, in fact, when defendant did leave his residence he was permitted to take his daughter with him. Defendant agreed to remain separate from his daughter during the questioning, he was told that he was free to leave at any time, and at no point did the officers imply that defendant would have to leave his daughter in their custody if he left the premises. (Ex. F at 12:00; ECF No. 66 at 56.) Under the totality of the circumstances, the second Willaman factor is neutral.

15. With respect to the third Willaman factor, the record indicates that the questioning lasted approximately thirty-two minutes. (ECF No. 66 at 61.) The questioning did not last for hours which might have led a reasonable person to conclude that he was in custody, but it also did last more than a brief period of time, such as ten minutes, which would not lead a reasonable

person to believe he was in custody. *Compare, e.g.,* United States v. King, 604 F.3d 125, at 138 (3d Cir.2010) (holding that an interrogation which lasted "several hours" weighed in favor of a finding of custody), *with* United States v. Killingsworth, 118 F. App'x 649, 651–52 (3d Cir.2004) (finding an interrogation lasting less than ten minutes not to indicate a custodial situation). Courts have found that interviews lasting longer than thirty-two minutes were noncustodial for Miranda purposes. *See* United States v. Bassignani, 575 F.3d 879, 886 (9th Cir. 2009) (finding that defendant was not in custody, even though the two-and-a-half hour length of the interrogation weighed in favor of finding that the interview was custodial); Killingsworth, 118 F. App'x at 651–52 (3d Cir. 2004) ("courts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial"); Tukes v. Dugger, 911 F.2d 508, 515 (11th Cir. 1990) (interview between one-and-a-half and two hours not considered custodial); United States v. Bright, Criminal Action No.09-62, 2010 WL 2490912, at *4 (D. Del. June 21, 2010) (three-hour long interview considered a neutral factor under Willaman); United States v. Bishop, Criminal Action No. 05-240, 2006 WL 167953, at *3 (W.D. Pa. Jan. 20, 2006) (45-minute conversation deemed noncustodial). Because the period of questioning was not lengthy or particularly short the third factor is neutral. *See* McFall, 2012 WL 194078, at *6.

16. With respect to the fourth Willaman factor, there is no indication that the officers used any coercive or physical tactics. Detective Erdely testified that the interview took place in a conversational tone and that he did not yell or become hostile with defendant. (ECF No. 66 at 51.) Detective Erdely stated that the interview was "cordial" conversation and that defendant did not appear to be afraid during their interaction. (Id. at 61.) Both officers were carrying firearms, but neither displayed or drew their weapons in defendant's presence. (Id. at 52.) Defendant was not placed in handcuffs, (Id. at 52.), and while he was not permitted to roam freely around the

13

house due to the ongoing search of the premises and the presence of a weapon in the home, he was permitted to move around the house as long as an officer was present. (Id. at 66.) None of the coercive tactics described in Willaman, such as "hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement," Willaman, 437 F.3d at 359-60, were present in this case. For preservation of evidence and security purposes, defendant was required to remain in the presence of a law enforcement agent throughout the duration of the search of his home. This alone does not rise to the level of coercion. The fourth factor weighs in favor of a finding that the interview was noncustodial.

17. With respect to the fifth Willaman factor, it is clear based on defendant's own statements that he voluntarily submitted to the testimony. Defendant understood that he was given the option not to talk to the agents and chose to speak with them anyway. When defendant inquired about the possibility that he might need a lawyer, Detective Erdely told defendant that he was free to speak with an attorney, offered to stop the interview, and even offered to speak with the attorney if defendant was able to contact one. (Id. at 66.) Defendant, however, stated, "I want to cooperate, I want to cooperate. I want to get this over with. I want to move on with my life." (Ex. F at 27:45.) Because defendant voluntarily submitted to questioning, the fifth Willaman factor weighs in favor of a finding that the interview was noncustodial.

18. While not factors under Willaman, in determining whether an interrogation was custodial or noncustodial the Third Circuit Court of Appeals also considers "the information known by the officer concerning the suspect's culpability", United States v. Jacobs, 431 F.3d 99, 105 (3d Cir.2005) (citing Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir.1974)), and "whether the officer revealed his or her belief that the suspect was guilty," Id. (quoting Stansbury, 511 U.S. at 325). While Detective Erdely conducted the investigation that led to defendant's

14

interview, and, therefore, had prior knowledge of any evidence pointing to defendant's guilt, it does not appear that Detective Erdely possessed or voiced strong beliefs about defendant's culpability or that he " '[bore] down in interrogation and creat[ed] the kind of atmosphere of significant restraint that triggers *Miranda.*' " Jacobs, 431 F.3d at105 (quoting Steigler, 496 F.2d at 799). Detective Erdely described the conversation as "cordial," which was confirmed by the contents of the recorded conversation. Additionally, Detective Erdely explained to defendant on several occasions that he was there to learn from defendant and at no point in the recording do his questions appear accusatory. *See* (Ex. F at 27:05) ("It's always just been you and me talking because I want to know what's going on in your head."); (Id. at 1:20) ("This is a fact-finding mission.").

19. The only instance defense points to support his claim that Detective Erdely believed defendant was guilty and revealed this belief to defendant during the questioning was when Detective Erdely stated in the recording that he had seen "a computer, in this residence, on numerous occasions, sharing child pornography."(Ex. F at 0:50). This statement is ambiguous with respect to Detective Erdely's belief that defendant was guilty; the statement refers only to a computer being used to share child pornography in the house and does not point to the defendant being the individual who used the computer for that purpose. At best, these additional factors are neutral.

20. Upon consideration of all the circumstances surrounding the questioning of defendant, and in further consideration of the factors outlined in Willaman, the court concludes that the government met its burden and showed that a reasonable person in defendant's position would have perceived that he was free to terminate the conversation with Detective Erdely and Corporal Roche and to leave the premises.

15

21. Because defendant was not in custody during the questioning, the officers were not required to give him Miranda warnings. Miranda, 384 U.S. at 437 (1967). Their failure to do so does not provide a basis for a motion to suppress defendant's statement. Defendant's motion to suppress on Miranda grounds will be denied.

### The Voluntariness of the Confession

22. Involuntary confessions violate the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution. Colorado v. Connelly, 479 U.S. 157, 165 (1986).

23. An involuntary statement made to a law enforcement officer is inadmissible into evidence. United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)).

24. To determine the voluntariness of a confession, the court must assess, under the totality of the circumstances, whether the confession was the result of an essentially free and unconstrained choice by its maker. Schneckloth, 412 U.S. at 225. If a person's will is overborne or his capacity for self-determination is critically impaired, his or her statements are involuntary. Id. at 225-26. The voluntariness determination is subjective, and the court should take account of the suspect's background and experience. Jacobs, 431 F.3d at 108. Relevant factors to consider in evaluating voluntariness, therefore, include not only the crucial element of police coercion, but also may include the defendant's maturity, education, physical condition and mental health. See Colorado v. Connelly, 479 U.S. 157, 167 (1986); Withrow v. Williams, 507 U.S. 680, 693 (1993).

25. "A necessary predicate to a finding of involuntariness is coercive police activity."

Id. (citing Connelly, 479 U.S. at 167). "Further, there must be some causal connection between the police conduct and the confession." Id.

26. The burden is on the government to establish, by a preponderance of evidence, that the challenged statement was voluntary. Id.

27. Here, the government established that the police were not coercive in their tactics, as previously discussed. *See supra* ¶ 16. The officers were dressed in plain clothes, arrived in an unmarked car, and did not brandish their weapons. (ECF No. 66 at 19.) The conversation between defendant and Detective Erdely was "cordial" and defendant did not appear to be afraid during the interaction with officers. (Id. at 61.) Detective Erdely gave defendant a choice to talk to him or not, and the infringements on his freedom of movement in the residence were reasonably directed at maintaining officer security and preservation of evidence. While the officers did keep defendant separate from his daughter during the interview, defendant agreed that the separation was warranted given the sensitive nature of the questioning. (Ex. F at 12:00; ECF No. 66 at 56.)

28. There was no evidence in the record that defendant has mental or physical conditions that limited his ability engage in a voluntary conversation with the officers on January 6, 2011. The record reflects that defendant spoke intelligently, that he worked for a drug company at the time the officers interviewed him, and that his job that required the use of a computer. (Id. at 60.) In addition, the court observed from the recorded conversation between defendant and Detective Erdely that defendant had no difficulties understanding or responding to the questions posed to him. There is nothing in the record indicating that defendant's personal characteristics limited his ability to voluntarily speak to law enforcement agents.

29. The government met its burden to show that there was no coercive police conduct.

Based upon the evidence presented, defendant's statements were voluntary within the meaning of the Due Process Clause. Defendant's motion to suppress on involuntariness grounds will be denied.

Date:   May 17, 2017

By the court,

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge